STOLZ v. DETROIT, GRAND HAVEN & MILWAUKEE RAILWAY CO.

1. MASTER AND SERVANT—RAILROADS—NEGLIGENCE — TRACK AND ROADBED—CULVERTS.

Evidence tending to show that plaintiff's decedent, an engineer in the employ of defendant, was killed in a wreck caused by the settling of the track and roadbed after a heavy storm, that the accident occurred at a point where the track crossed a deep ravine, that the culvert there located had been cracked for a considerable time, and sand and dirt had sifted through and the water had undermined it until the roadbed had been

rendered unsafe, sufficiently presented a question of fact as
to defendant's negligence in maintaining and inspecting the
roadbed.

2. Same—Inspection—Requirements.

Where, after admitting testimony relating to the failure of de-
fendant to conform to one of its rules requiring its section
hands to make an examination of its track after the storm
which caused the washout, the court informed the jury that
plaintiff could not complain of that omission, and later cau-
tioned the jury not to consider such testimony, the error, if
one was committed, did not prejudice defendant.

Error to Genesee; Wisner, J.   Submitted February
24, 1911.   (Docket No. 120.)  Reargued October 6, 1911.
Decided November 3, 1911.

Case by Frances Stolz, administratrix of the estate of
William Stolz, deceased, for the wrongful killing of de-
cedent.   Judgment for plaintiff.   Defendant brings error.
Affirmed.

*Harrison Geer*, for appellant.

*Seth B. Terry* (*Brown, Farley & Selby*, of counsel),
for appellee.

Bird, J.   Plaintiff's husband was killed while in the
employ of defendant, and this suit was commenced by the
widow under the death act to recover damages therefor.
She recovered a judgment in the trial court, and the de-
fendant has brought it here for review.

The deceased was employed by defendant as a locomo-
tive engineer.   In the early morning of April 19, 1909, he
was going east over defendant's line hauling a freight train.
Just before reaching Fuller Station, and while crossing a
deep ravine on a high embankment, the track and road-
bed suddenly settled, thereby derailing the locomotive,
wrecking the train, and causing his death.   The ravine
was very deep, and had been filled with a 30-foot embank-
ment.   The embankment was 17 feet on top and sloped at
the sides at an angle of 45 degrees.   A culvert constructed

of limestone, 90 feet long, 4 feet wide, and 4½ feet high, extended through the embankment, with wing walls, 8 feet long, built out at the south end to hold in place the embankment and to keep the dirt from washing out and sliding down. The top of the culvert was formed by placing iron rails across on top of the walls and laying brick and mortar between the flanges. Above this was a stone arch. The floor was paved with hard heads.

The negligence relied upon by the plaintiff was the failure of defendant to furnish the deceased with a reasonably safe roadbed and track upon which to perform his work; and the particular negligence complained of was the failure of defendant to give the culvert and roadbed reasonable and proper inspection and to make necessary and reasonable repairs. It was the theory of plaintiff that through a crack in the east wall of the culvert, directly under the track, the sand and dirt had sifted through into the culvert and been carried out by the action of the water, and that this had gone on until the roadbed had become so undermined and weakened that the weight of the train broke through it.

The defendant's counsel introduced a large amount of evidence showing that there was a very severe storm and an unusual rainfall on the night in question. It was also shown by him that there were frequent inspections of the culvert by those upon whom that duty rested. It was counsel's theory that the unprecedented rainfall on the roadbed had washed it out and caused it to slide down at the south end of the culvert, and that the accident was due to the act of God, rather than the negligence of the defendant. The trial court charged the jury that there was no testimony that the culvert was improperly constructed, but left it to them to determine whether the culvert, roadbed, and track had been maintained in a reasonably safe condition, and whether proper inspection and repairs had been made. Defendant's counsel insists this was error, and he argues that there was no competent testimony from which the jury could find that the

culvert was not properly constructed or maintained. As this is the main question in the case, it will require an examination of some of the evidence to determine whether counsel is right in this assertion.

Mr. Harry Fellmer testified that he was a farmer and owned the land adjacent to the north end of the culvert; that he went to the wreck soon after it occurred. In speaking of the condition of the culvert, he said:

" I have seen that it has been crumbling and breaking down for the last four years. * * * I first noticed this limestone was commencing to crumble away about four years before the wreck, and that condition was increasing as time went on. There was nothing to hold the wings at the south end at all. With the water going over there it took the dirt away from under the sides, and took it down in the ditch. There is one piece of that broke off and fell in, that I stepped on to get in that weighed over 200 pounds. * * * I should judge it had worked back in from the end of the culvert about six feet, somewhere around there. From where that wing connected to the end of the culvert would be crumbled away about two feet. * * * I had observed the action of the water on the other pieces that had crumbled off there. They came through there every time it rained. They would go further and further. I have lived there 11 years."

The plaintiff's theory of the cause of the accident was likewise supported by the testimony of Albert Wilson, a farmer, who had lived near the culvert for many years, and who examined it more or less critically in November, 1908. He testified that the wing walls at the south end had disintegrated and the east one had nearly disappeared, and that as a result of it the water had worked around in the rear of the east wall, and that the action of the water had also washed out a reservoir at the outlet of the culvert, which would hold about 150 barrels of water. With reference to the sand sifting through into the tunnel, he testified, in part, as follows:

" I saw some places in there, about the center, I should judge, nearly under the track, where there had some dirt sifted down through there, ran down beside the wall, at

pretty near the top of it. It was dark, and I could not see where it came from. The sand apparently seemed to have run in there, certainly on one side."

This same witness, with many others, testified that after the wreck, in the roadbed, immediately east of the culvert, there was a large hopper-shaped hole, about 12 feet across the top, and tapering as it went down into the culvert. This hole was filled with the wreckage of the cars. When the wreckage was removed, the north wall of the hole and a part of the south wall remained intact. This tended to strengthen the theory that the roadbed had been undermined in accordance with plaintiff's theory. It was argued by defendant's counsel that the hopper-shaped hole was made by spiles driven by the wrecking crew. We do not so read the testimony. Several of the witnesses distinguished the holes made by the spiles from the large hole in question. Mr. Wilson also testified to other defects in the walls of the culvert at the south end.

Defendant's counsel criticises Mr. Wilson's testimony, and charges that no reliance can be placed upon it because he has so mingled the facts with his theories. Mr. Wilson was in a position to know the condition of the culvert, and, so far as the record discloses, he was a disinterested witness, and related his testimony with apparent candor. His testimony about the defective condition of the culvert is corroborated in part by several witnesses, and we see no reason for saying that his testimony is unworthy of belief. It was for the jury to say what credit should be given to it. His testimony was sufficient to carry to the jury the question as to whether the culvert had been maintained in a reasonably safe condition. The testimony was such, if believed by the jury, to justify them in finding as they did, and we think the trial court was not in error in refusing to find that the verdict was against the weight of the evidence.

Error is also assigned because the trial court admitted testimony of the failure of the sectionmen to patrol the track after the storm and before the coming of the train.

This failure was counted on in the declaration as one of the grounds of negligence, and testimony was admitted in support of it. At the close of the proofs, the trial court, being of the opinion that no recovery could be had on that ground, said to the jury in the opening paragraph of his charge that:

" Lest I should neglect to call your attention to it later on, I think I will say to you on the start that there has been some evidence admitted into this case in regard to a rule of the railroad company requiring, in substance, that certain of its employés, after severe storms of rain or wind, should pass over the track and know that it was in a safe condition. Upon examination of the law and argument had during your absence, I became satisfied that under the law the plaintiff could not complain of that, that the decisions are such that the plaintiff would not be entitled to complain of the fact that those people did not go over the track immediately after this rainstorm, so that branch of the evidence you will give no consideration."

Before finishing his charge, he again cautioned them not to consider the testimony. In view of these warnings, we are persuaded that the admission of the testimony was cured, and that it worked the defendant no injury.

We have examined the other errors assigned, and we are of the opinion that they are not well taken.

The judgment of the trial court is affirmed.

OSTRANDER, C. J., and STEERE, MOORE, MCALVAY, BROOKE, BLAIR, and STONE, JJ., concurred.